STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GARY STEVENS, DEFENDANT-APPELLANT.

Argued October 25, 1988—Decided June 1, 1989.

*Maria M. DeFilippis,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney, *William Welaj,* Designated Counsel, on the briefs).

*Meredith A. Coté,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

*Evidence Rule* 55 prohibits the introduction into evidence of other crimes or civil wrongs to prove a defendant's criminal disposition as a basis for establishing guilt of the crime charged. The Rule expressly permits such evidence to be admitted to prove other facts in issue, such as "motive, intent, plan, knowledge, identity, or absence of mistake or accident," but admissibility is subject to the trial court's duty to weigh the probative value of the evidence against its capacity for prejudice. *State v. Ramseur,* 106 *N.J.* 123, 265 (1987); *Evid.R.* 4. In this case we consider whether testimony about three alleged incidents of misconduct, factually analogous to the two events for which defendant was indicted, was properly admitted into evidence under *Rule* 55.

The Appellate Division affirmed defendant's conviction for two counts of official misconduct, *N.J.S.A.* 2C:30–2(a), and one count of criminal coercion, *N.J.S.A.* 2C:13–5. 222 *N.J.Super.* 602 (1988). It concluded that the trial court correctly ruled that testimony concerning incidents of misconduct not the subject of the indictment was admissible under *Rule* 55. Defendant appeals to this Court as of right on the basis of the dissent below. *R.* 2:2–1(a). We affirm.

I.

The material facts are set forth in detail in the Appellate Division opinion, 222 *N.J.Super.* at 605–13, and for our pur-

poses a brief summary will be sufficient. Defendant, a Westhampton, New Jersey, police officer, was indicted on the basis of two incidents that occurred in January and February 1982. The victim involved in the first incident, Jeanette Potter, was stopped in her car by police officers, including defendant, after visiting a friend in a Mount Holly motel. Potter and her sister were transported to Westhampton police headquarters. According to Potter's testimony, defendant took her statement and then locked himself and Potter in an interrogation room. He informed her that she had been detained in connection with a drug investigation of the friend she visited in Mount Holly, and that he had to search her body for needle marks. Asserting a need to examine her stomach, defendant required Potter to remove her blouse and lower her pants. Defendant stated that if Potter proved she was not a drug addict, he would release her. Defendant's trial testimony was that he recalled arresting Potter, but did not search her or require her to undress.

The victim of the second incident, Jane Ann Petroski, had been issued two traffic tickets in the early morning hours of February 22, 1982. Subsequently, her car ran out of gas. She parked in the Westhampton police station parking lot and used an available outside telephone to call for assistance. Defendant, who had learned of her presence at headquarters through a radio communication, arrived soon afterwards. Petroski testified that defendant initially asked for driving credentials. He then took her inside the station and required that she perform certain balancing tests, presumably to determine sobriety. Defendant informed Petroski that she had failed the tests and would have to be searched. Defendant first directed her to remove her socks and boots, then to expose her breasts, and then to remove her pants, ostensibly to permit defendant to verify that nothing was taped between her legs. He then required her to spread her legs, both from a sitting and standing position. Petroski testified that she submitted to defendant's demands because she was alone and frightened.

She also testified that defendant drove her home, commenting as she left the car: "Don't screw me and I won't screw you." Defendant denied that he had searched Petroski or required her to disrobe.

Later that morning, Ms. Petroski's mother reported the incident to Westhampton Police Chief Russel Minuto. Minuto testified that defendant denied the allegations and insisted that another member of the Westhampton Police Department, Officer Montijo, was present during Ms. Petroski's detention and would confirm defendant's innocence. Officer Montijo testified that he rejected defendant's subsequent request to confirm his account of the incident to Chief Minuto, and informed Chief Minuto that he was not present when defendant interrogated Petroski. Defendant denied that he told Chief Minuto that Officer Montijo was with him, and denied asking Montijo to lie for him.

Defendant was arrested in April 1982 in connection with the Petroski incident and again in May 1982 in connection with his alleged search of Jeanette Potter. Captain Neil Forte of the Burlington County Prosecutor's office testified that on the occasion of defendant's arrest in May 1982, defendant offered to resign from the department or plead guilty to a disorderly-persons offense if Forte would terminate the investigation. Defendant disputed Forte's account of their conversation.

In response to the State's proffer of other-crime evidence, the trial court conducted a pretrial hearing, *Evid.R.* 8, to determine the admissibility of testimony concerning three other instances of alleged misconduct committed by defendant. The trial court ruled that the testimony was admissible under *Rule* 55, and that its probative value outweighed any prejudice to defendant. Accordingly, at trial the State was permitted to present evidence of these incidents, which may be summarized as follows:

## A.

The first incident occurred in mid-August 1979, approximately two-and-one-half years prior to the events for which defen-

dant was indicted. At approximately 2:55 a.m., defendant stopped a motorist, Brenda McCabe, and requested her driving credentials. Defendant noted that her insurance identification card was invalid. He removed from her pocket a pack of cigarettes that contained two marijuana joints. Defendant commented that Ms. McCabe was in trouble, and expressed a desire to engage in sexual relations. Defendant instructed Ms. McCabe to follow him to police headquarters, but instead turned down a dirt road. When the cars stopped, defendant entered Ms. McCabe's car and had sexual intercourse with her on the front seat. He then returned the marijuana and released her. At trial defendant denied that the incident had occurred.

## B.

The second incident took place during the fall of 1981. Defendant suggested to his patrol partner, Officer Harvey Montijo, that they go look for some "parkers." When they happened upon two young girls, the defendant ordered one to pull her pants down and stopped the other from pulling her pants up. He explained to Montijo that he was looking for weapons and drugs. When Montijo objected, defendant replied that "[i]t comes with the job. It's part of the job and that's some of the fringe benefits of the job." At trial defendant denied attempting to search either girl or asking either to disrobe. He claimed that Montijo never expressed to him any concern about his actions.

## C.

The third incident occurred in February 1982, between the dates of the two events for which defendant was indicted. Paula Jones, an assistant restaurant manager at a Howard Johnson hotel, testified that she was confronted by defendant two days after she had stayed overnight at the hotel with a male companion. According to Jones, defendant stated that he saw her drop a bag of marijuana from her purse when he was

in the restaurant two nights earlier. He also claimed to have investigated a complaint of excessive noise at the hotel, and observed her through a window to be unclothed in the presence of two men. He informed her that Chief Minuto had instructed him to call her employer "and tell them what kind of person they had working for them." Ms. Jones testified that defendant told her he had taken care of everything, and that she would not be arrested. She also testified that defendant made suggestive comments intimating a desire to receive sexual favors in return for his assistance to her. Although defendant acknowledged his presence at the Howard Johnson hotel on the date in question, he testified that he was called there to remove an employee. He denied the conversation to which Ms. Jones had testified.

As noted, the trial court ruled that evidence of the three incidents was admissible, concluding that there was clear and convincing evidence that the incidents had occurred and that their probative value outweighed any prejudice to defendant. In accordance with *Evidence Rule* 6, the trial court instructed the jury concerning the limited relevance of the three events:

Now, what about the other three incidents which we permitted you to hear about? * * * I permitted this, not to show—and it doesn't show that the defendant is a bad person—not to show that he was generally disposed to commit these crimes against Potter and Petroski. On the other hand—and you may not deduce from hearing about these other three incidents that he's a bad person or that he generally was disposed to commit these two offenses. But it's made known to you to show his *intent* toward Potter and Petroski, or his *plan* regarding young women coming under his control while he was carrying out his official duty, period. Or, in other words, to show his *attitude* toward or his relationship to these young women, or, finally to—to show his *state of mind* toward young women coming under his control with respect to his own sexual desires. [Emphasis added].

The Appellate Division majority concluded that evidence of the three unindicted instances of misconduct was properly admitted to prove that "defendant had acted in accordance with the same common plan, design or scheme to commit such criminal acts," 222 *N.J.Super.* at 618; "to establish his state of mind that he possessed the authority to lodge false criminal

prosecutions thus enabling him to threaten his victims if they refused his advances," *ibid.;* and "to prove that defendant had committed the misconduct and coercion intentionally and that he had not done so based on some mistaken impression or happenstance." *Id.* at 619. The dissent disagreed with the majority's reliance on the "common plan" exception to *Rule* 55, contending that that exception "requires that the 'other crimes' have been 'committed for the accomplishment of a single purpose, and that purpose is manifestly the sole cause of the commission of the crime alleged * * *.'" 222 *N.J.Super.* at 625 (Brody, J., dissenting) (quoting *State v. Zicarelli*, 122 *N.J.Super.* 225, 241 (App.Div.1973), certif. denied, 63 *N.J.* 252 (1973), *cert.* denied, 414 *U.S.* 875, 94 *S.Ct.* 71, 38 *L.Ed.*2d 120 (1973)). Judge Brody also criticized the majority's holding as permitting other-crime evidence to be used to rebut a defense not advanced by the defendant:

> The majority also mislabels the evidence as proof of defendant's "intent" to strip search women in his control for an unlawful purpose. Defendant denied the strip searches, he did not claim that they were for a lawful purpose. Evidence may not be admitted under an exception in Rule 55 to rebut a defense that is not in issue. [*State v.*] *Peltack*, 172 *N.J.Super.* 287, 292–293 (1980). *See State v. Atkins*, 78 *N.J.* 454, 462 (1979). [222 *N.J.Super.* at 625.]

The dissent also characterized the trial court's limiting instruction as "halting and contradictory," *id.* at 624, observing that the instruction failed to explain the distinction between the evidence's admissibility to prove "attitude," "intent," "plan," or "state of mind," and its inadmissibility to show a predisposition generally to commit crime. *Id.* at 624–25 (Brody, J., dissenting).

## II.

*Rule* 55 states:

> Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion[ ] is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but subject to Rule 48. Such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

*Rule* 55 was adopted in New Jersey in 1967. *See* Biunno, *Current New Jersey Rules of Evidence,* Preliminary Comments to the Rules at xv. It was based substantially on *Rule* 55 of the Uniform Rules of Evidence prepared by the National Conference of Commissioners on Uniform State Laws. *See* 1963 Report of the New Jersey Supreme Court Committee on Evidence, Introduction at 1–2, Comment on Rule 55 at 101 (hereafter 1963 Report). The Rule had initially been proposed for adoption in substantially its present form by the Committee on the Revision of the Law of Evidence (Jacobs Committee), *see* Report of the Jacobs Committee, May 1955, at 106–07, and in 1956 by the Commission to Study the Improvement of the Law of Evidence (Bigelow Commission), *see* Report of the Bigelow Commission, Nov.1956, at 48–49. It perpetuated New Jersey's long-standing common-law rule that excluded other-crimes evidence when offered solely to prove a defendant's propensity to commit crime. *See, e.g., State v. Kociolek,* 23 *N.J.* 400, 418–20 (1957); *State v. Donohue,* 2 *N.J.* 381, 388 (1949); *State v. Lederman,* 112 *N.J.L.* 366, 370–73 (E. & A. 1933); *State v. Schuyler,* 75 *N.J.L.* 487 (E. & A. 1907); *State v. Fay,* 127 *N.J.L.* 77 (Sup.Ct.1941); *State v. Raymond,* 53 *N.J.L.* 260, 264–65 (Sup.Ct.1891). The New Jersey cases reflect the prevailing common-law rule throughout the United States. *See McCormick, Evidence* § 190, at 557–58 (E. Cleary 3d ed. 1984); *Wigmore, Evidence* §§ 193–94 at 641–47 (3d ed. 1940); Stone, *The Rule of Exclusion of Similar Fact Evidence: America,* 51 *Harv.L.Rev.* 988 (1938) (hereinafter Stone).[1] The common-law rule has been described as

---

[1]For a general discussion of the admissibility of other-crime evidence, see Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic and Injustice in the Courtroom,* 130 *U. of Pa.L.Rev.* 845 (1982); Comment, *Developments in Evidence of Other Crimes,* 7 *U.Mich.J.L.Ref.* 535 (1974); Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters,* 70 *Yale L.J.* 763 (1961); Lacy, *Admissibility of Evidence of Crimes Not Charged in the Indictment,* 31 *Ore.L.Rev.* 267 (1952); Slough & Knightly, *Other Vices, Other Crimes,* 41 *Iowa L.Rev.* 325 (1956).

a compromise between two extreme possibilities: on the one hand that other acts, because they cast light on propensities and thence on the issues, may always be fully explored; on the other hand that other acts must be absolutely excluded because of the prejudice, confusion, and surprise their use would create. The common law accepted neither extreme. It rejected the former; it only adopted the latter subject to the all-important reservation that if other acts were relevant to guilt of the crime charged otherwise than merely through propensity, then those acts might like any other relevant facts be explored. [Stone, *supra*, 51 *Harv.L.Rev.* at 1033–34.]

Underlying *Rule* 55 and its common-law antecedents is the recognition that other-crime evidence may simultaneously be highly probative and extremely prejudicial.

That the defendant in a criminal prosecution, for instance, has previously committed a crime, or even many crimes, may have great probative value, especially where the crimes are similar or identical to the crime in issue, and where they have happened recently. [1963 Report at 101.]

Despite its probative worth, other-crime evidence offered solely to prove criminal disposition is excluded under the Rule, as at common law:

The motivating policies are said to be to avoid confusion, unfair surprise and prejudice. 1 Wigmore, Evidence (3d ed. 1940), section 194. It is thought that proof of a previous crime will distract the jury, leading them to forego an independent analysis of the evidence and to rely merely on the tendency they possess in common with most people of saying "once a thief—always a thief" * * *. [*State v. Ascolese*, 59 *N.J.Super.* 393, 397 (App.Div.1960) (quoting *State v. Nagy*, 27 *N.J.Super.* 1, 11 (App.Div.1953)).].

■ ■ Pursuant to *Rule* 55, other-crime evidence is admissible to prove other facts in issue. The examples set forth in the *Rule*—motive, intent, plan, knowledge, identity, absence of mistake or accident—are not intended to be exclusive. *See* Report of the Jacobs Committee, *supra,* Drafters' Comment at 107 ("It must be understood, however, that the specifications are only exemplary and not exclusive. The illustrative material could be eliminated without hurting the rule except to the extent that the one applying it would have to hunt harder for its meaning."). The non-exclusivity of the examples in *Rule* 55 was also stressed by the 1963 Report of the New Jersey Supreme Court's Committee on Evidence:

This list of exceptions is not intended as an exclusive catalogue. It is merely illustrative of the kind of exceptions under which the evidence might be

admitted, although the exceptions cited are the most familiar ones. It is the intendment of the Rule to provide for the discretionary admission of "other crimes" and "other torts" evidence where it is relevant to any substantial issue other than disposition to commit crime or torts. [1963 Report at 102–03.]

*See also* Biunno, *Current New Jersey Rules of Evidence,* comment 10 to *Evid.R.* 55 ("[T]he instances mentioned in the rule are 'only illustrative' ").

█ A necessary corollary to the principle that other-crime evidence can be admitted to prove any fact in issue—whether or not included among the specific examples set forth in *Rule* 55—is the requirement that the "issue" be genuine, and that the other-crime evidence be necessary for its proof. As one commentator explains:

"Probative worth," however, consists of more than logical relevance or persuasiveness. No matter how persuasive of the fact it is supposed to prove, other crimes evidence has no probative worth if the fact is not in issue. Perhaps the clearest case would be other crimes evidence offered to prove a fact not material to proof of the charged crime—for example, specific intent in a manslaughter trial. Because such evidence does not advance the search for truth, it serves no purpose which might justify whatever prejudice it creates, and is excluded for that reason. A similar situation would exist when the accused concedes the issue to be proved—for example, when he admits committing the act in question and bases his defense on some other grounds. Courts have applied this principle to forbid the introduction of evidence on issues which seem impossible to dispute, and which are in fact not contested. [Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters,* 70 Yale L.J. 763, 770–71 (1961).]

Thus, in *State v. Niemeyer,* 195 *N.J.Super.* 559 (Law Div.1984), defendant was indicted for aggravated assault after he caused a head-on collision driving his automobile under the influence of alcohol. In order to prove the "reckless" element of aggravated assault, *N.J.S.A.* 2C:12–1(b)(1), the State offered evidence of prior drunk-driving convictions to establish that defendant consciously disregarded a substantial risk of injury. *N.J.S.A.* 2C:2–2(b)(3). The court held the evidence of prior convictions to be inadmissible:

However, the question is not whether knowledge is an integral part of an element of the offense. Rather, the question is whether it is necessary to prove it—that is whether the defendant's knowledge is really in issue.

\* \* \* \* \* \* \* \*

* * * [I]t is not necessary to show that a person has been convicted of driving while under the influence in order to prove that he had knowledge that he would be incapable of driving a car if he were drunk. I think it is safe to say that it is fairly common knowledge that drinking and driving do not mix. The jury as fact finders, could certainly infer from evidence that defendant had consumed a quantity of alcohol and was intoxicated at the time in question, that he consciously disregarded the risks involved in driving an automobile while drunk or impaired. Simply stated: the defendant's knowledge of the risks resulting from driving under the influence is not in issue. [195 *N.J.Super.* at 562-64.]

*Cf. State v. Atkins,* 78 *N.J.* 454, 462 (1979) (upholding admissibility of other-crime evidence, but suggesting that when defendant does not specifically contest issue for which evidence is offered, prejudice to defendant may outweigh probative value); *State v. Peltack, supra,* 172 *N.J.Super.* at 293 ("Proof [of other crime evidence] is allowed only to meet an issue relating to an element of the offense which is projected by defendant either before or during trial or is necessarily raised by the evidence.").

■ After a trial court determines whether other-crime evidence is material to a fact genuinely in issue, the probative value of the proffered evidence should be carefully balanced against the danger that it will create undue prejudice against the defendant. As we noted in *State v. Ramseur:*

Evidence of past crimes does not automatically become admissible just because it is relevant to the issue of motive or intent. In each case the trial court must weigh the probative value of the evidence against its prejudicial effect. *State v. Atkins,* 78 *N.J.* 454, 461 (1979). The temporal remoteness of a past wrong affects its probative value. *See State v. Schuyler,* 75 *N.J.L.* 487, 488 (E. & A. 1907). If the probative value of the evidence is outweighed by the threat of prejudice, the evidence should be excluded under *Evidence Rule* 4. The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard. *See State v. Atkins, supra,* 78 *N.J.* at 462. [106 *N.J.* at 265-66.]

■ There is widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant.

The likelihood of prejudice is acute when the proffered evidence is proof of a defendant's uncharged misconduct. As part of the Chicago Jury Project, researchers attempted to determine the impact of a defendant's prior criminal record on the probability of conviction. The researchers found that conviction

rates were significantly greater after a jury learned that the defendant had a criminal record or had been charged with even a minor crime. The researchers concluded that juries aware of prior misconduct employ an entirely "different * * * calculus of probabilities" to determine the defendant's guilt or innocence. * * *

* * * A confession may be the most damning type of prosecution evidence, but uncharged misconduct evidence is not far behind. Furthermore, uncharged misconduct is subject to greater abuse than confession evidence. * * * In the case of uncharged misconduct evidence, however, the evidence often has dual relevance. Evidence of uncharged misconduct may be admitted for some limited purpose such as proving the defendant's motive. Under such a theory the evidence would have the independent relevance required by rule 404(b). Nevertheless, any act of misconduct by the defendant also is relevant to show his general bad character, and lay jurors are "imbued with the commonly held * * * notion, 'once a crook, always a crook.'"

In response, the courts have recognized the special dangers posed by the dual relevance of uncharged misconduct evidence. Thus, the courts evolved the common-law doctrine of balancing probative value against probative danger in uncharged misconduct cases. [Imwinkelried, *The Need to Amend Federal Rule of Evidence 404(b): The Threat to the Future of the Federal Rules of Evidence*, 30 *Vill.L.Rev.* 1465, 1487–89 (1985) (footnotes omitted).]

It is this inflammatory characteristic of other-crime evidence that mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice. In weighing the probative worth of other-crime evidence, a court should consider not only its relevance but whether its proffered use in the case can adequately be served by other evidence.

The trial judge should be careful to exclude other torts or crimes evidence, even though it is independently relevant, wherever he can reasonably do so without damaging the plaintiff's or prosecutor's case. For example, if the prosecutor has adequate proof of identity, or of motive and the like, he should not be permitted to use the highly inflammatory evidence of other crimes to establish those facts. In a forgery case where authorship of the allegedly forged writing is in issue, the trial judge, for instance, should not admit standards indicating the defendant's guilt of other forgeries if neutral standards of the defendant's handwriting are available to the prosecutor. [1963 Report at 103.]

*See also* Note, *Other Crimes Evidence, supra,* 70 *Yale L.J.* at 772 ("Thus in determining probative worth, the court should evaluate the prosecution's other admitted and admissible evidence to determine whether the offered other-crimes evidence is necessary to prove the issue beyond a reasonable doubt.").

If the other-crime evidence is admitted, the trial court must instruct the jury concerning its limited relevance, *Evid.R.* 6; *see State v. Cusick,* 219 *N.J.Super.* 452, 466 (App.Div.1987). It should do so, however, with a clear understanding that strict compliance with such a "limiting" instruction is an extraordinarily difficult task for the average juror. As one commentator observed, "The theory of 'limited use' under which such explosive evidence is put before the jury fails to correspond to the actual effect of the evidence even in the minds of the most sober and conscientious jurors." Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic and Injustice in the Courtroom,* 130 *U. of Pa.L.Rev.* 845, 882 (1982). Accordingly, a limiting instruction addressed to the use of other-crime evidence admitted under *Rule* 55 should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere. *Cf. State v. Concepcion,* 111 *N.J.* 373, 379 (1988) ("Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case.").

## III.

The offense of official misconduct, of which defendant was convicted,[2] is defined as follows:

A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or

b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

---

[2] Defendant was also convicted of criminal coercion, *N.J.S.A.* 2C:13-5, but the trial court's ruling that evidence of the unindicted incidents was admissible appears to relate only to the offense of official misconduct.

Official misconduct is a crime of the second degree. If the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less, the offense of official misconduct is a crime of the third degree. [*N.J.S.A.* 2C:30–2.]

In the context of the incidents for which defendant was indicted, the State was required to prove that defendant's alleged "search" of Jeanette Potter and Jane Petrowski was an "unauthorized exercise of his official functions," committed "with purpose to obtain a benefit for himself," and with knowledge that the act was unauthorized. The State's theory was that the "benefit" sought by defendant was the gratification of his sexual desires. The trial court held that the evidence of the three unindicted incidents was relevant to show defendant's "intent toward Potter and Petroski;" or to show his "plan regarding young women coming under his control * * *;" or to show his "attitude toward or his relationship to these young women;" or to show his "state of mind toward young women coming under his control with respect to his sexual desires." 222 *N.J.Super.* at 615–16. The Appellate Division's affirmance was based on the majority's view that the unindicted incidents proved defendant's "common plan, design or scheme" in which he "used his position as a police officer to intimidate helpless females if they did not submit to degrading sexual acts to satisfy * * * his prurient interests." *Id.* at 617–18. The majority opinion also found the evidence relevant to prove defendant's "state of mind that he possessed the authority to lodge false criminal prosecutions thus enabling him to threaten his victims if they refused his advances." *Id.* at 618.

Although the trial court and Appellate Division majority justify admissibility of the other-crime evidence by reference to enumerated examples set forth in *Rule* 55 such as "intent" and "plan," more is required to sustain a ruling admitting such evidence than the incantation of the illustrative exceptions contained in the Rule. Thus, the "plan" example contemplates more than a strong factual similarity between the "other crimes" and the indicted offense. The "plan" example refers to instances in which the other-crime evidence proves the exist-

ence of an integrated plan, of which the other crimes and the indicted offense are components. As we observed in *State v. Louf,* 64 *N.J.* 172, 178 (1973): "[W]here such [other crime] evidence tends to establish the existence of a larger continuing plan of which the crime on trial is a part, it is admissible for such purpose." *Accord State v. Zicarelli,* 122 *N.J.Super.* 225, 241 (App.Div.), certif. denied, 63 *N.J.* 252, *cert.* denied, 414 *U.S.* 875, 94 *S.Ct.* 71, 38 *L.Ed.*2d 120 (1973); *State v. Fay, supra,* 127 *N.J.L.* at 83; *see* Biunno, *Current New Jersey Rules of Evidence,* comment 10 to *Evid.R.* 55; *McCormick, supra* at 559; *cf. United States v. Lewis,* 693 *F.*2d 189, 193 (D.C.Cir. 1982) ("[T]he testimony was admitted to show that appellant had a scheme which included the offenses for which he was on trial."); *United States v. Parnell,* 581 *F.*2d 1374, 1383–84 (10th Cir.1978) ("Culver's testimony concerning the San Antonio scheme was * * * proof of * * * the continuation of a common plan."). In this case, evidence of the unindicted offenses did not establish the existence of an integrated plan or scheme.

 The Appellate Division's reference to "state of mind," and the trial court's reference to "intent" and "state of mind," as grounds for admitting the other-crimes evidence are somewhat imprecise to the extent that they purport to articulate the issue concerning which the other-crime evidence is relevant. Nevertheless, it is self-evident that the State was required to prove not only that the "searches" of Potter and Petroski occurred, but that the defendant's "purpose" in conducting the searches was "to obtain a benefit for himself," and also that defendant knew that the searches constituted "an unauthorized exercise of his official functions." *N.J.S.A.* 2C:30–2. The evidence of the unindicted offenses was inadmissible as the basis for an inference that the searches of Potter and Petroski occurred as alleged by the victims. *Evid.R.* 55. But such evidence was relevant to prove, assuming the jury concluded that the searches did take place, that defendant conducted the searches to gratify his sexual desires and did so knowing that such conduct was unauthorized. On those issues

—defendant's purpose for conducting the searches and his knowledge that such conduct was an unauthorized exercise of his official position—evidence of the circumstances in which defendant had previously used his office to intimidate women into disrobing or providing sexual favors was highly probative. Although "intent" and "state of mind"—the phrases used by the courts below to sustain admissibility of the other-crimes evidence—fairly suggest the evidence's relevance to these statutory elements of the crime of official misconduct, we would encourage an enhanced degree of precision in explicating the specific grounds for admitting such evidence.

The dissenting opinion below asserts that because defendant denied conducting the searches, he raised no issue concerning the purpose for which the searches were conducted. Despite defendant's denial that the searches occurred, the State was required to prove both their occurrence and defendant's unlawful purpose in conducting the searches. Thus, defendant's unlawful purpose was a genuine issue in the case. *Supra* at 301–302. Defendant's denial that the searches occurred did not relieve the State of its burden to prove that his purpose was to gratify his sexual desires, and not merely to discharge his official duties. To the extent that *dicta* in *State v. Peltack,* *supra,* 172 *N.J.Super.* at 292–93, may be read to suggest the inadmissibility of other-crime evidence to prove a material element of a crime not specifically contested by the defendant nor otherwise established by the evidence, it is disapproved. In any event, the record reveals that defendant's purpose for conducting the alleged searches was specifically contested. Defense counsel during summation argued vigorously that, assuming the searches had occurred, the State had not proved beyond a reasonable doubt that defendant conducted the searches for his personal benefit.

We are not persuaded, however, that the issue of defendant's knowledge that the alleged searches were unauthorized, *N.J.S. A.* 2C:30-2a, was so genuinely contested as to require admissibility of the other-crime evidence to establish that element of

the statutory offense. In any event, other evidence admitted at trial adequately established that aspect of the crime.

We are fully in accord with the trial court's conclusion that the probative value of the other-crime evidence outweighed its capacity for undue prejudice.[3] Apart from the other-crime evidence, the State had no independent proof tending to establish that defendant's purpose in searching the victims was to gratify his sexual desires. Had this evidence been excluded, the State's ability to prove this issue would have depended on whether the jury believed the defendant or the victims, and if it believed the victims, whether it would infer from their testimony that defendant's purpose in conducting the searches was his sexual gratification. Thus, the other-crime evidence was both probative and necessary to prove a fact genuinely in issue, with respect to which the State's other evidence was limited.

We have no doubt that the other-crime evidence in this case had the capacity to prejudice the jury generally against the defendant. That common characteristic of other-crime evidence, however, is not sufficient to require its exclusion. As Chief Justice Weintraub observed:

> That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, were inextricably entwined with the material facts. [*State v. West*, 29 *N.J.* 327, 335 (1959).]

Under these circumstances, we find no abuse of discretion in the trial court's conclusion that the danger of undue prejudice did not require exclusion of the other-crime evidence. *See State v. Atkins, supra*, 78 *N.J.* at 462.

 We agree with the dissent below that the trial court's limiting instruction in this case, *supra* at 297–298, was not adequate to clarify for the jury the narrow distinction

---

[3] Of the other-crime evidence admitted, it is self-evident that the alleged circumstances of the McCabe incident, *supra* at 295–96, possessed the greatest capacity for prejudice. However, we would not disturb the trial court's exercise of discretion in balancing prejudice against the probative value of the evidence.

between the permissible and impermissible uses of the other-crime evidence. As noted above, the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction. *Supra* at 304. Recognizing this dilemma, trial courts should take pains to instruct juries carefully and comprehensively, with ample reference to the specific evidence and issues in a case, on the limited relevance of other-crime evidence. *Evid.R.* 6. A trial court instructing a jury on its use of other-crime evidence should state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered.

Nevertheless, we conclude that the deficiencies in the trial court's instruction in this case do not warrant reversal of defendant's convictions. Although aspects of the instruction were somewhat contradictory, the trial court twice cautioned the jury against considering the other-crime evidence to prove defendant's disposition to commit the offenses with which he was charged. Indeed, this was the essential point to be made in the limiting instruction. Moreover, on the decisive issue in the case—whether defendant conducted unauthorized searches of Potter and Petroski—there was ample evidence of guilt, including the testimony of Chief Minuto and Officer Montijo concerning the aftermath of the Petroski incident, and Captain Forte's testimony recounting defendant's incriminatory statement at the time of his arrest for the Potter incident. We are fully satisfied that in this case any error arising from a lack of clarity in the limiting instruction was harmless and not clearly capable of producing an unjust result. *R.* 2:10-2.

The judgment of the Appellate Division is affirmed.

For affirmance—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN-7.

Opposed—None.